DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

———————————————

PROGRESSIVE SELECT INSURANCE COMPANY,

Appellant,

v.

LLOYD'S OF SHELTON AUTO GLASS, LLC, as assignee of Bruce Farlow,

Appellee.

No. 2D2023-0490

———————————————

December 11, 2024

BY ORDER OF THE COURT:

Appellee filed a Notice of Withdrawing "Appellee's Motion for Rehearing, or Rehearing En Banc" on October 21, 2024. The court treats the notice as a motion to withdraw Appellee's Motion for Rehearing, or Rehearing En Banc and grants the motion.

On the court's own motion, the June 7, 2024, opinion in this case is withdrawn, and the attached corrected opinion is substituted therefore. The corrected opinion corrects typographical errors on pages 19 and 21. No further motions for rehearing or rehearing en banc will be entertained in this appeal. The clerk is directed to issue the mandate contemporaneously with the corrected opinion.

I HEREBY CERTIFY THE FOREGOING IS A

TRUE COPY OF THE ORIGINAL COURT ORDER.


MARY ELIZABETH KUENZEL

CLERK

# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

_____

PROGRESSIVE SELECT INSURANCE COMPANY,

Appellant,

v.

LLOYD'S OF SHELTON AUTO GLASS, LLC, as assignee of Bruce Farlow,

Appellee.

No. 2D2023-0490

_____

December 11, 2024

Appeal pursuant to Fla. R. App. P. 9.130 from the Circuit Court for Hillsborough County; Melissa Polo, Judge.

Jordan M. Thompson, Megan E. Alexander, and Carlos G. Gomez of Young, Bill, Boles, Palmer, Duke & Thompson, P.A., Tampa, for Appellant.

David M. Caldevilla of de la Parte, Gilbert, McNamara & Caldevilla, P.A., Tampa; Michael V. Laurato of Austin & Laurato, P.A., Tampa; and Anthony T. Prieto of Morgan & Morgan, P.A., Tampa, for Appellee.


ATKINSON, Judge.

Progressive Select Insurance Company appeals the trial court's order granting Lloyd's of Shelton Auto Glass, LLC's motion for leave to amend its complaint to seek punitive damages pursuant to section 624.155(5), Florida Statutes (2020). Progressive correctly contends that

the evidence Lloyd's of Shelton proffered in support of its motion was insufficient to allow a claim for punitive damages. As such, we reverse.

## Background

In February 2019, Bruce Farlow selected Lloyd's of Shelton, an auto glass repair shop, to replace the windshield on his vehicle after it sustained damage. Instead of paying Lloyd's of Shelton directly for its services, Mr. Farlow assigned his insurance benefits to Lloyd's of Shelton. Lloyd's of Shelton then sent an invoice to Progressive, Mr. Farlow's insurer, requesting payment of $1,420.97 for its replacement of Mr. Farlow's windshield.

Mr. Farlow's insurance policy provided that, "[i]f **you** pay the premium for Comprehensive Coverage, **we** [Progressive] will pay for sudden, direct and accidental loss to a windshield on a **covered vehicle** that is not caused by **collision**, without applying a deductible." But any payments for such loss were subject to the following limitation of liability:

> In determining the amount necessary to repair damaged property to its pre-loss physical condition, the amount paid by **us** [Progressive]:
>
> (i)  will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us** [Progressive]; and
>
> (ii)  will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:
>
> > (a)  original manufacturer parts or equipment; and
> >
> > (b)  nonoriginal manufacturer parts or equipment.

The policy set forth an appraisal process to resolve any disagreements, which in relevant part provides as follows:

2

> If **we** [Progressive] cannot agree with **you** on the amount of loss, then **we** [Progressive] or **you** may demand an appraisal of the loss. . . . Within 30 days of any demand for appraisal, each party shall appoint a competent and impartial appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to an impartial umpire chosen by the appraisers, who is both competent and a qualified expert in the subject matter. If the two appraisers are unable to agree upon an umpire within 15 days, **we** [Progressive] or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire will be binding.

After receiving the invoice from Lloyd's of Shelton, Progressive responded with a letter addressed to Mr. Farlow and Lloyd's of Shelton stating, in relevant part, the following:

> Lloyd's of Shelton . . . does not agree with what [Progressive] has determined to be the reasonable amount that is necessary to repair or replace the windshield. We recognize that a dispute exists with respect to the amount that is necessary to repair or replace the windshield, and the purpose of this letter is to explain that the insurance policy provides that an appraisal is the method to be used to resolve the disagreement.

> We are issuing to [Lloyd's of Shelton], under separate cover, but contemporaneously with this letter, a payment in the amount that [Progressive] has determined to be the reasonable amount that is necessary to repair or replace the windshield. As a dispute exists with respect to the amount of loss, please be advised that [Progressive] immediately places [Mr. Farlow] and [Lloyd's of Shelton] on notice that it invokes its right to appraisal as set forth in the insurance policy.

> . . . .

> [Progressive]'s selected appraiser is Linda Rollinson, Auto Glass Industry Services . . . .

3

Progressive determined the reasonable amount necessary to replace Mr. Farlow's windshield to be $486.82 and, in accordance with the letter, paid that amount to Lloyd's of Shelton.

The record does not show that any further communications between Progressive and Lloyd's of Shelton occurred. Lloyd's of Shelton filed a breach of contract action against Progressive in county court seeking $934.15—the difference between the amount it invoiced Progressive and the amount Progressive paid. The county court dismissed the action without prejudice and compelled the appraisal process pursuant to the insurance policy. Lloyd's of Shelton appointed Melissa Martin as its appraiser who, together with the other appraiser, Ms. Rollinson, agreed to an appraisal award of $882.27. Progressive then paid $395.45 to Lloyd's of Shelton, which was the difference between its original payment and the appraisal award.

After the appraisal process concluded, Lloyd's of Shelton filed a bad faith action against Progressive in the circuit court on March 10, 2020, alleging statutory violations under sections 624.155(1)(b) and 626.9541, Florida Statutes (2020). Lloyd's of Shelton alleged that Progressive had imposed "deeply discounted fixed pricing for all windshield replacement services," unlawfully and automatically invoked appraisal based on its fixed pricing without analyzing whether the amount invoiced by Lloyd's of Shelton qualified for payment under the policy's limitation of liability provision, and "retain[ed] a patently biased third party appraiser." Lloyd's of Shelton later moved for leave to amend its complaint to seek punitive damages pursuant to section 624.155(5), arguing that these acts occurred with such frequency as to indicate a general business practice and were in reckless disregard for the rights of the insured. In support of the motion, as "record evidence and proffer as to a reasonable

4

basis in the record to permit amendment for punitive damages," Lloyd's of Shelton designated deposition testimony of Progressive's corporate representative, Mark Root, and of Ms. Rollinson, the appraiser selected by Progressive, as well as the insurance policy and Lloyd's of Shelton's sworn interrogatory answers and referred to a "Safelite Agreement."[1]

The evidence showed that, to determine the amount Progressive pays for windshield claims, Progressive begins by reviewing the recommendations issued by the National Auto Glass Specifications (NAGS). Mr. Root testified that NAGS is an "objective entity that's recognized by both insurance companies and glass repair facilities as established benchmark pricing for glass replacement claims." NAGS issues its pricing recommendations three times per year, which includes recommendations for pricing of windshield parts and the number of hours to perform a replacement but not for hourly labor rates.

However, Mr. Root testified that Progressive "appl[ies] a discount to that NAGS rate" when paying claims involving windshield replacements because "the NAGS benchmark pricing is typically higher than the market rate will bear." To determine how much to discount the NAGS rate, Mr. Root testified that Progressive reviews its "glass-only claims data," "reporting of glass invoice data . . . billed to us by affiliate [and] nonaffiliate . . . glass facilities," and reports of what other "anonymous insurance carriers . . . pay for similar services." At the time of his November 30, 2022, deposition, Mr. Root testified that, "right now,"

---

[1] Though Lloyd's of Shelton proffered deposition testimony about Safelite and its relationship to Progressive, there is no actual "Safelite Agreement" in the record. At the time of the events giving rise to this appeal, the agreement was the subject of a pending petition for writ of certiorari in this court in which Progressive challenged the trial court's discovery order compelling the production of the agreement.

Progressive applies a 52% "parts discount" to the NAGS list price. He also testified that Progressive accepts the NAGS recommendation for the number of hours to replace a windshield and that Progressive had determined a reasonable and necessary labor rate to be $40 per hour based upon its review of its glass data and reports. Each time NAGS issues updates to its recommended pricing, Progressive "take[s] that as an opportunity to review [its] glass pricing as it relates to any of those updates."

Mr. Root testified that "Safelite Solutions" is Progressive's "third-party administrator" that takes inbound calls regarding windshield claims from Progressive policyholders, gathers necessary information, and audits invoices based on Progressive's pricing and billing rules. In exchange, Progressive pays Safelite a fee for each claim. If a repair or replacement is needed, the insured can choose a repair shop or Safelite can assist the insured in doing so. Mr. Root testified that "Safelite Solutions is not permitted to steer any customer to any particular shop." However, Ms. Rollinson testified that Safelite otherwise does employ a steering practice when receiving calls from Progressive insureds. She testified that Safelite explains to the insured that if he or she picks a provider that is "not a network shop, then . . . we can't guarantee their pricing" and that "[t]here could be out-of-pocket expense, but if you go to Safelite, you won't have to worry about that."

As to the appraisal process, Ms. Rollinson estimated that she had performed "several hundred thousand" appraisals for Progressive over a four-to-five-year period. Progressive paid Ms. Rollinson for each appraisal she performed, although the fee fluctuated depending on the needs of each appraisal. In addition to performing appraisals, Ms. Rollinson owned her own auto glass repair company—Superior Auto

6

Glass of Tampa Bay, Inc. ("Superior"). Superior had a "verbal agreement" with Progressive, under which Progressive would not attempt to "steer" customers from Superior, which was not a "Safelite network shop," to other "network shop[s]." Additionally, Progressive agreed not to invoke the appraisal process on any claims in which Superior requested payment. In exchange, Superior agreed to accept a price for its windshield repair and replacement services that was discounted from the NAGS rate. This discounted price, while less than what Superior would ordinarily charge, was "more than [Progressive paid to] other nonnetwork shops." Ms. Rollinson testified that no part of the verbal agreement with Superior obligated Progressive to use her as an appraiser and that neither the verbal agreement nor Progressive influenced her appraisals in any way. She described that it was "normal" for repair shops to have different agreements with different insurance companies.

After a hearing, the trial court entered a written order granting Lloyd's of Shelton's motion for leave to assert a claim for punitive damages. The trial court found that that "there is a basis in the record to establish that" Progressive's letter demanding an appraisal contained a material misrepresentation that it "adjusted [the] loss to the amount required by the insurance policy," when in reality Progressive "simply applied its discounted pricing parameters[] without consideration of the prevailing competitive price standards set forth in the insurance policy's limitation of liability provision." This, the trial court explained, formed a basis to conclude that Progressive had violated section 626.9541(1)(i)2, which provides it is bad faith to make a material misrepresentation to an insured for the purpose of effecting a settlement on less favorable terms than those provided in the policy," and section 626.9541(1)(i)3.b, which provides it is bad faith to misrepresent pertinent facts or policy

7

provisions relating to coverages at issue with such frequency as to indicate a general business practice. The trial court found a basis to conclude that Progressive's misrepresentation also constituted a second bad faith violation because the letter did not provide a reasonable explanation in writing for the basis in the policy for the offer to compromise, in violation of section 626.9541(1)(i)3.f. The trial court found that there was a basis to conclude Progressive committed a third bad faith violation by failing to adopt or implement proper standards for investigating claims, in violation of section 626.9541(1)(i)3.a, because Progressive's standard "was not much more than the insured pressing a prompt and being offered a 52% discount off of the NAGS benchmark price or be 'steered' to a different repair shop." Finally, under the totality of the circumstances, which the trial court characterized as a "scheme" whereby Progressive offered an insured a 52% discount price or else compelled the insured to participate in a "rigged" appraisal with a "biased appraiser who was financially incentivized to side with Progressive," the trial court found there was a basis to conclude that Progressive did not act in good faith to settle the claim when it could have done so if it had acted fairly and honestly, in violation of section 624.155(1)(b)1. The trial court also found there was a reasonable evidentiary basis to conclude that Progressive's acts were "a willful, wanton, and malicious scheme, or one which is in reckless disregard for the rights of insureds," and occurred with "sufficient frequency as to indicate a general business practice."

## Analysis

Progressive contends on appeal that the evidence Lloyd's of Shelton proffered in support of its motion was insufficient to support an amendment to seek punitive damages. Our review is de novo. *See CCP*

*Harbour Island, LLC v. Manor at Harbour Island, LLC*, 373 So. 3d 18, 27 (Fla. 2d DCA 2023) ("Appellate courts review a trial court's decision to grant a motion to amend a complaint to add claims for punitive damages de novo." (citing *Progressive Select Ins. v. Ober*, 353 So. 3d 1190, 1192 (Fla. 4th DCA 2023))). "In evaluating the sufficiency of the evidence proffered in support of a punitive damages claim, the evidence is viewed in a light favorable to the moving party." *Id.* (quoting *Case v. Newman*, 154 So. 3d 1151, 1157 (Fla. 1st DCA 2014)); *see also Est. of Blakely v. Stetson Univ., Inc.,* 355 So. 3d 476, 481 (Fla. 5th DCA 2022) ("The appellate court views the record evidence and the proffered evidence in the light most favorable to the plaintiffs and accepts said evidence as true for the purpose of reviewing whether a reasonable basis exists for punitive damages.").

"In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages." § 768.72(1), Fla. Stat. (2020). " '[A] reasonable showing by evidence in the record or proffered by the claimant' refers to actual evidence that would provide a prima facie basis to recover punitive damages." *DeSanto v. Grahn*, 362 So. 3d 247, 249 (Fla. 4th DCA 2023) (quoting § 768.72(1)). To recover punitive damages in a bad faith action against an insurer, the insured must show, in relevant part, that "[1] the acts giving rise to the violation occur with such frequency as to indicate a general business practice and [2] these acts are . . . (a) [w]illful, wanton, and malicious . . . [or] (b) [i]n reckless disregard for the rights of any insured."[2] § 624.155(5).

---

[2] Although not relevant here, the insured may also satisfy the second element of section 624.155(5) with a showing that the insurer's

9

While this court's task is to review the evidentiary sufficiency of Progressive's acts in light of the punitive damages standards, it is inherently necessary in doing so to consider the underlying acts in relation to the bad faith standards at issue. *Cf. CCP Harbour Island*, 373 So. 3d at 28 (reasoning that "this court cannot entertain the Appellant's invitation to review the sufficiency of Manor's abuse of process claim because we can only review specified nonfinal orders as enumerated in Florida Rule of Appellate Procedure 9.130," but noting that "consideration of the elements of the abuse of process cause of action is relevant to reviewing the trial court's order"). At minimum, a court must identify conduct to support the elements of the cause of action in order to identify the "acts giving rise to the [bad faith] violation" and assess whether those acts satisfy the criteria in the punitive damages statute. *See* § 624.155(5); *Cable News Network, Inc. v. Black*, 374 So. 3d 811, 816 (Fla. 4th DCA 2023) ("To determine whether [the movant] made a reasonable showing that he is entitled to recover punitive damages, we must first 'understand the specific claim proposed by the plaintiff that may justify an award of punitive damages.' " (quoting *Varnedore v. Copeland*, 210 So. 3d 741, 745 (Fla. 5th DCA 2017))). And on appeal, it is necessary to point out places where the trial court might have *misidentified* conduct that would "giv[e] rise to [a] violation" that would constitute bad faith because only conduct appropriately supportive of the cause of action is relevant to the question of whether such "acts" are "[w]illful, wanton and malicious" or "[i]n reckless disregard for the rights of any insured." *See* § 624.155(5); *cf. HRB Tax Grp., Inc. v. Fla.*

---

actions were "[i]n reckless disregard for the rights of a beneficiary under a life insurance contract." § 624.155(5)(c).

*Investigation Bureau, Inc.*, 360 So. 3d 1159, 1162 (Fla. 4th DCA 2023) (reversing an order permitting amendment because "the trial court improperly considered allegations and evidence not relevant to the claim for which punitive damages were sought"); *Long v. Kropke*, 370 So. 3d 319, 320 n.1 (Fla. 4th DCA 2023) ("We have not considered any of the Kropkes' proffered evidence that did not relate to a specific allegation in their proposed amended complaint.").  Moreover, if it is clear that the underlying tort has not even been sufficiently alleged, much less supported by a reasonable basis in the record evidence or proffer, a court cannot logically conclude that the punitive damages standard has been satisfied.  *Cf. Ober*, 353 So. 3d at 1193 (concluding as part of its inquiry of whether the insured had supported that "the insurer engaged in the acts giving rise to the bad faith claim 'with such frequency as to constitute a general business practice' " that "the insured *did not demonstrate the insurer violated Florida law* in accepting verbal rejections at the time the policy issued" or "proffer evidence that policies identified in the insurer's Declaration involved similar circumstances so as to constitute a business practice" (emphasis added) (quoting § 624.155(5), Fla. Stat. (2009))).  And although an appellate court should not reweigh evidence, if there is no evidence to support even an adequately alleged bad faith cause of action, then there cannot be a reasonable evidentiary basis to conclude that the alleged acts giving rise to a bad faith violation were undertaken in such a way as to meet the punitive damage standard.

Our dissenting colleague's neglect of the identification of "acts giving rise to the [alleged bad faith] violation[s]," § 624.155(5), elides that punitive damages are a *remedy* that might be awarded in connection with an underlying cause of action.  Our dissenting colleague might be

11

more persuaded by the punitive damages theory advanced by Lloyd's of Shelton, but the allegations supporting that theory only come before us in the context of the underlying bad faith causes of action, thereby necessitating an evaluation of whether there is a record basis for "acts" that "giv[e] rise" to the alleged bad faith violations against which a reviewing court must apply the punitive damages standard—that those acts must be "willful, wanton, and malicious" or "in reckless disregard of the rights of any insured," *id.*—a standard which our dissenting colleague fails to meaningfully address.

Central to the determination of whether Progressive's acts were willful, wanton, and malicious or in reckless disregard for an insured's rights is the meaning of the insurance policy provision, the violation of which Lloyd's of Shelton has made central to its bad faith theory. Lloyd's of Shelton asserts that, as assignee of the insured, it has the right to be paid the "prevailing competitive price" as set forth in the policy's limitation of liability provision, not Progressive's "deeply discounted fixed pricing" at 52% of the NAGS rate. The policy entitles the insured to be paid for a "sudden, direct, and accidental loss to a windshield," which is limited to "the amount necessary to repair damaged property to its pre-loss physical condition." But the policy further provides that "the amount necessary" shall not exceed "the prevailing competitive labor rates in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by [Progressive]." Lloyd's of Shelton, as assignee, is bound by this provision, in which Progressive has the right to reasonably determine the components of the liability limitation. *See Vice City Marina, LLC v. Four Ambassadors Master Ass'n*, 314 So. 3d

694, 696 (Fla. 3d DCA 2021) ("[A]n assignee stands in the shoes of the assignor, receiving only those rights that are transferred.").

The policy requires Progressive to pay no more than is "*necessary* to repair" the windshield and allows Progressive to "reasonably determine[]" an amount that does not "exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment." (Emphasis added.). *See State Farm Mut. Auto Ins. v. Menendez*, 70 So. 3d 566, 569 (Fla. 2011) ("In interpreting an insurance contract, we are bound by the plain meaning of the contract's text."). Progressive obviously does not have carte blanche in making this determination, cabined as it is by the policy's reasonableness requirement. However, the policy language presumes that some rates charged by some providers will not be in the range reasonably determined to be prevailing in the competitive market. After all, the policy does not say Progressive is to pay *any* rate charged by *any* provider an insured chooses, regardless of whether it can be reasonably determined that such rate is necessary to repair the damage and does not exceed a prevailing competitive price. No reasonable reader of the text of the provision could disagree that it contemplates a limit outside which Progressive is not obligated to pay.

The record and the briefing in this appeal indicate that the parties would agree that any examination of the reasonableness of Progressive's determination of the amount necessary to repair a windshield must be undertaken through the lens of what the policy provision describes as the "prevailing competitive" price.[3] According to the record evidence,

---

[3] While a close inspection of the language of the provision reveals that a case could be made that the qualifying phrase "prevailing competitive" only modifies "labor rates" and not "the cost of repair or replacement parts and equipment," this court need not determine

13

Progressive has determined that through negotiated agreements it has established a network of "affiliated" providers that will do the job for a price 52% discounted from NAGS. And the only evidence in the record showing how Progressive made that determination was Mr. Root's testimony that Progressive analyzed the NAGS recommended pricing and various reports and data to determine the amounts it would pay for labor and parts. There is no basis in the record to impugn the reasonableness of Progressive's chosen process or the reasonableness of the conclusion that "the NAGS benchmark pricing is typically higher than the market rate will bear," much less that it constitutes a bad faith violation undertaken willfully, wantonly, and maliciously or in reckless disregard of the insured's right under the policy.

The insured has the right to have his or her claim paid in an amount reasonably determined to be necessary to repair the windshield. That Progressive's pricing determinations are accepted by repair shops within the "Safelite network"—and that Progressive concludes that such determinations are within the prevailing competitive rate—but "nonnetwork shops" like Lloyd's of Shelton charge higher prices does not indicate a violation of such right, much less one that has been recklessly disregarded. Nothing in the insurance policy proscribes Progressive's pricing determinations in the event it can secure lower prices through a network of repair shops or other agreement or renders those prices unreasonable or noncompetitive. The fact that Progressive can lower its costs through effective business strategies—such as, say, leveraging its

---

whether that term modifies both subjects because the parties have argued as though it modifies both. A reading that the modifier only applies to the former and not the latter would not affect the resolution of this appeal.

volume of claims to obtain pricing advantages—belies, rather than supports, such a notion.

Describing that Progressive's conduct "place[d] the insured in the predicament of having to choose between getting underpaid or bearing the costs associated with th[e] appraisal," the trial court set up a false dichotomy that begs the question of what is a reasonable determination of the amount necessary to repair the windshield within the prevailing competitive price. In other words, the trial court presumed what the "prevailing competitive price" is in a dispute about what the "prevailing competitive price" is, supposing as a matter of course that receiving anything less than what the insured or its assignee demands—or nothing more than Progressive determined—necessarily constitutes "getting underpaid." The trial court's formulation, as does Lloyd's of Shelton's argument, relies on the unsubstantiated premise that Progressive was obligated to offer something more than the 52% discounted rate when presented with a windshield repair invoice that exceeded that amount.[4] As the trial court described it, Progressive "could have offered the correct amount of benefits to the insured in settlement (rather than paying those to [an] appraiser)."

The trial court's unsupportable premise that what Progressive offered to pay could not possibly be the "correct" price fatally taints its conclusion that Lloyd's of Shelton met the statutory requirement for entitlement to punitive damages on its bad faith theories. The record

---

[4] We presume for the sake of analysis that Progressive's initial pricing determination of $486.82 was less than the NAGS recommended pricing. Lloyd's of Shelton did not provide or proffer any evidence of what the price would have been if Progressive had paid the NAGS recommended pricing for Mr. Farlow's claim in 2019. Nor did Lloyd's of Shelton provide any evidence of what level of discount from the NAGS rate Progressive paid for Mr. Farlow's claim.

15

evidence readily demonstrates the opposite possibility—that such a discounted rate could more reasonably be understood as the "prevailing competitive price" as "reasonably determined" by Progressive because Progressive could routinely obtain the prices at which it had arrived pursuant to its market research. Because Progressive might employ market hegemony to obtain such prices does not mean such prices are not "competitive." And because Progressive obtains such prices through negotiated agreements and the establishment of networks of affiliated providers does not mean the resulting transactions are not part of a competitive market for windshield replacement goods and services. *Cf. GEICO Gen. Ins. v. Superior Auto Glass of Tampa Bay, Inc.*, 49 Fla. L. Weekly D169, D174 n.4 (Fla. 2d DCA Jan. 17, 2024) ("Nothing in the policy indicates that GEICO's use of effective negotiating strategies to secure lower prices—relying, for instance, on volume as a potential means of achieving some degree of market hegemony—renders those prices noncompetitive. In other words, competing successfully to reduce costs does not—as the circuit court appellate opinions suggest—remove the resulting lower-cost transactions from the realm of 'a competitive market.' "). In the face of a record tending to show that Progressive's determination of the prevailing competitive price was *reasonable*, Lloyd's of Shelton cannot possibly meet its burden to establish a reasonable basis to conclude that such a determination was in *reckless* disregard for the insured's rights, much less that it was willful, wanton, and malicious.

Our dissenting colleague misconstrues what is meant by our assertion that the trial court was begging the question. This opinion does not raise and then answer the question of what the prevailing competitive price is. Rather, the trial court's rationale is subject to

16

criticism because *it presumes* what the prevailing competitive price *must be,* conveying in no uncertain terms its presumption that the "correct" price must necessarily be higher than what Progressive offers to pay or what Progressive can routinely obtain by way of its negotiated networks—and then accepting Lloyd's of Shelton's bad faith and punitive damages theories based on that unsupportable premise. Our dissenting colleague seems to commit the same logical fallacy when she presumes as part of her analysis the existence of a "standard pricing" that cannot *possibly* be close to the rate that Progressive negotiated with providers other than Lloyd's of Shelton—and that, therefore, what Progressive offers to pay before invoking appraisal is *necessarily* an amount that is "steeply discounted."

The only way to square the circle of the trial court's reasoning is to infer the premise that Progressive should have recognized there was no dispute giving rise to the entitlement to the appraisal process because Progressive should have recognized that the "prevailing competitive price" is what Lloyd's of Shelton included in its invoice—or, at a minimum, somewhere in the middle of Progressive's determination and what Lloyd's of Shelton was demanding. But this reasoning writes the appraisal process out of the policy. It presumes that there is a "correct amount" that is ascertainable prior to the appraisal process, even though the very purpose of the appraisal process is to determine an amount to be paid when, as here, the parties do not agree on the "correct amount." *See Mendota Ins. v. At Home Auto Glass, LLC*, 346 So. 3d 96, 98 (Fla. 5th DCA 2022) ("[W]hen the insurer admits that there is a covered loss, but there is disagreement on the amount of loss, it is for the appraisers to arrive at the amount to be paid." (quoting *Johnson v. Nationwide Mut. Ins.*, 828 So. 2d 1021, 1025 (Fla. 2002))).

17

The trial court's reliance on the false premise that Progressive should have recognized there was no price dispute is made explicit in the trial court's characterization of Progressive's letter invoking appraisal. Because the letter suggested that Lloyd's of Shelton had rejected Progressive's price, the trial court found a basis to conclude that Progressive had made a misrepresentation in violation of the bad faith statute when it "create[d] a dispute where none exists." *See* § 626.9541(1)(i)2, (1)(i)3.b (listing certain misrepresentations as unfair claim settlement practices that can give rise to a bad faith violation under section 624.155(1)). But Progressive's letter was merely a mechanism of communicating that it and Lloyd's of Shelton did not agree, tracking the language of the policy, in which the right to invoke the appraisal process arises "[i]f **we** [Progressive] cannot agree with **you** on the amount of loss, then we [Progressive] *or* you may demand an appraisal of the loss." (Italic emphasis added; bolded emphasis in original.). It can only be presumed that Lloyd's of Shelton was fully aware of what it charged Progressive, and when it received the letter from Progressive communicating what Progressive believed to be the prevailing competitive price, Progressive's assertion that *Lloyd's of Shelton* had "rejected" *Progressive's* price therefore cannot be said to have deceived Lloyd's of Shelton into misperceiving the situation. One in receipt of the letter would know what the sender intended to convey—that is, the charged price was too high because the sender believes the prevailing competitive price is lower. At worst, Progressive is guilty of making a *presumption* that Lloyd's of Shelton would not be willing to budge on the price it stated in its invoice, i.e., that Progressive was prematurely *presuming* that Lloyd's would "reject[]" Progressive's assessment of the prevailing competitive price.

18

It is difficult to perceive of this as a "misrepresentation" given that Lloyd's of Shelton is presumed to have exhaustive knowledge of its own intentions and therefore, logically, cannot be susceptible to being deceived by another's presumption of what it intended to do. Indeed, any dispute has at least two parties, and either party has the ability to avert a "dispute" by coming around to the other party's position. Nothing in the record suggests that Lloyd's of Shelton was any more willing to meet what Progressive was willing to pay than Progressive was willing to pay what Lloyd's of Shelton was charging. So, a dispute did exist.

When Progressive sent its letter, the worst that could be said about its conduct is that it prematurely predicted that appraisal would be necessary to resolve the parties' dispute about what should be paid for Lloyd's of Shelton's services. But that is not a misrepresentation. And even accepting for the sake of discussion that it could be characterized as a misrepresentation, it could not be a "*material* misrepresentation" or one of "*pertinent* facts." *See* § 626.9541(1)(i)2 (providing that an unfair claim settlement practice occurs when an insurer makes a "*material* misrepresentation to an insured . . . for the purpose and with the intent of effecting settlement of such claim, loss, or damage under such contract or policy on less favorable terms than those provided in, and contemplated by, such contract or policy" (emphasis added)); § 626.9541(1)(i)3.b ("Misrepresenting *pertinent* facts or insurance policy provisions relating to coverages at issue." (emphasis added)). That is because although Progressive's prediction might have been premature, it was prescient. It turns out that Progressive was not wrong in its assessment that the parties "cannot agree" because Lloyd's of Shelton immediately filed a breach of contract action after receiving the letter. Of course, Progressive could have paid the invoice at its quoted price, but

the inverse is also true: once Lloyd's of Shelton—or any insured or assignee of benefits under the policy—received the letter, it could have accepted what Progressive was offering or made a counteroffer. Failure to do the former cannot be described as anything other than confirming Progressive's understanding that there was a dispute about what should be paid under the policy. And Progressive was within its rights under the policy to seek appraisal as a means of resolving that dispute.

Similarly, the trial court's conclusion that there was a record basis to conclude Progressive did not attempt in good faith to settle claims—but could and should have done so had it acted fairly and honestly—amounts to little more than a presumption that Progressive should have paid the invoice as submitted or, at the very least, paid something more than what it offered to pay. *See* § 624.155(1)(b)1. It cannot be established that Progressive was not attempting settlement in good faith—or was failing to do so willfully, wantonly, and maliciously, or in reckless disregard for the insured's rights—when it concluded that it need not pay more under a policy that requires it to pay its reasonable determination of the prevailing competitive rate and when the record supports that Progressive has a proven track record of obtaining the discounted rate it determines to be reasonably necessary. When an insured submits a claim, or an assignee submits an invoice, in an amount significantly higher than what Progressive can consistently obtain via its network providers—which is what Progressive concludes to be the prevailing competitive price—the question is what Progressive is obligated to do at that point. Nothing in the policy or under Florida law proscribes the practice that Progressive employs—that is, to express its disagreement with the amount requested and submit the resulting dispute to the appraisal process. And, as explained above, nothing

20

under Florida law proscribes the process that Progressive undertakes—pursuant to its right under the policy to make a reasonable determination of the amount necessary to repair a windshield—to arrive at its conclusion that a quoted price is more than what is prevailingly competitive.

Even presuming that Progressive jumps the gun by prematurely presuming there is a dispute, a finding of bad faith would require—at a minimum—the plaintiff to establish that *there was not a dispute*—and punitive damages entitlement would be premised on establishing a reasonable basis to conclude that the described falsehood was communicated with willfulness, wantonness, and maliciousness or in reckless disregard of the insured's rights. But unless Lloyd's of Shelton was willing to accept what Progressive offered or Progressive was willing to pay what Lloyd's of Shelton charged, *there was a dispute*. Even presuming that Lloyd's of Shelton would have accepted less or Progressive would have paid more—there was still a dispute because neither party was willing to pay what the other party deemed to be an appropriate price. Under the policy, that dispute may be submitted to the appraisal process.

Lloyd's of Shelton's contention that Progressive's purportedly "automatic" invocation of that appraisal process supports the amendment to seek punitive damages likewise fails to clear the statutory hurdle. To be sure, the record does not contain any evidence that Progressive communicated with Mr. Farlow or Lloyd's of Shelton regarding the amount to be paid for the windshield repair. It appears that Progressive's only communication was its letter invoking appraisal following receipt of the invoice from Lloyd's of Shelton. And Progressive's letter suggested that it was Lloyd's of Shelton that did not

21

agree with Progressive's pricing determination, when the record evidence arguably shows it was the other way around—it was Progressive that did not agree with the price requested by Lloyd's of Shelton. Reasonable minds could disagree about whether, on the one hand, it would be more reasonable or mannerly for Progressive to communicate with its insureds or their assignees to ascertain if they are willing to accept a lower price before undergoing the appraisal process or whether, on the other hand—given the volume of claims that Progressive handles—it may simply be a more efficient business practice to immediately invoke appraisal when it receives an invoice that significantly exceeds what it has determined to be the prevailing competitive rate. But neither the insurance policy, the bad faith statute, nor the statutory standard for punitive damages requires a minimum level of business decorum or collegiality in relations between insurers and their insureds or their insured's assignees. To the contrary, there is no right or obligation in the insurance policy for either party to engage in pre-appraisal negotiations. The policy simply provides either party with the right to demand an appraisal "[i]f [Progressive] cannot agree with [the insured] on the amount of loss," which Progressive did after it received Lloyd's of Shelton's invoice and did not agree with the amount it was requested to pay. And case law disabuses any notion of the existence of such an obligation because the appraisal provision itself sets forth the agreed method of resolving such price disputes. *Cf. Progressive Am. Ins. v. Hillsborough Ins. Recovery Ctr., LLC*, 349 So. 3d 965, 971 (Fla. 2d DCA 2022) ("Case law does not require Progressive to engage in good faith negotiations for its demand for appraisal to be ripe. . . . Once Progressive disagreed with Clear Vision on the amount of loss, it could demand appraisal."); *Am. Cap. Assurance Corp. v. Leeward Bay at*

22

*Tarpon Bay Condo. Ass'n,* 306 So. 3d 1238, 1240 (Fla. 2d DCA 2020) (explaining that a demand for appraisal is ripe when "postloss conditions are met, 'the insurer has a reasonable opportunity to investigate and adjust the claim,' and there is a disagreement regarding the value of the property or the amount of loss" (quoting *Citizens Prop. Ins. v. Admiralty House, Inc.,* 66 So. 3d 342, 344 (Fla. 2d DCA 2011))). To conclude otherwise would subject Progressive to potential punishment in the form of punitive damages for exercising its own contractual right to avail itself of the appraisal process.

As explained herein, there is no reasonable basis to conclude Progressive's pricing determination methodology was evidence of bad faith, much less that it was malicious, willful, and wanton, or in reckless derogation of Lloyd's of Shelton's rights under the policy. This necessarily undermines Lloyd's of Shelton's assertion that it was deprived of a right not to be immediately subjected to the appraisal process because the amount charged on its invoice exceeded the "fixed" price Progressive had determined it would pay without considering the policy's limitation of liability provision. To the extent the trial court concluded that Progressive misrepresented that it had adjusted the loss when in reality it had not, *see* § 626.9541(1)(i)2, (1)(i)3.b, that conclusion is without an adequate record basis. To conclude that the evidence supports such a theory necessarily relies on the unstated and unsupportable premises that the adjustment of windshield losses categorically requires Progressive to conduct a windshield-specific price determination (as opposed to the general method it employs to determine the prevailing competitive rate across a wide swath of data) or that Progressive is obligated to enter into a back-and-forth negotiation with each and every provider for each and every windshield if

23

Progressive determines it should pay anything less than what the provider charges in its invoice. This finds no support in the insurance policy provision, the bad faith statute, or applicable case law. *See Hillsborough Ins. Recovery Ctr., LLC*, 349 So. 3d at 971 (rejecting the proposition that an insurer is required to "engage in good faith negotiations" before invoking appraisal); *Am. Cap. Assurance Corp.*, 306 So. 3d at 1240.

The trial court also found a basis to conclude that Progressive's pricing determination amounted to a failure to implement proper standards for investigation of claims that was willful, wanton and malicious or in reckless disregard of the insured's rights. *See* § 626.9541(1)(i)3.a (listing the "[f]ail[ure] to adopt and implement standards for the proper investigation of claims" as an unfair claim settlement practice that can give rise to a bad faith claim under section 624.155(1)). Paying a 52% discount from the NAGS suggested rate is something Progressive established it could obtain in the market by means of its negotiated networks of affiliate providers. Evidence in the record suggests it has an ongoing process to "determine a reasonable and necessary pricing" for "windshield glass claim[s] in Florida." Lloyd's of Shelton has not argued or supported that there was anything special or peculiar about this (or that, or the other, or any) windshield. If Progressive is able to consistently negotiate a certain rate for windshields generally, then there is no obligation under the circumstances as alleged by Lloyd's of Shelton for Progressive to concoct another standard to investigate this type of claim on a more particularized basis. The trial court's conclusory description of Progressive's means of assessing windshield claims as "not aimed at 'properly' investigating the loss" is illuminated neither by Lloyd's of Shelton's arguments nor any evidence in

24

the record. Lloyd's of Shelton neither adduced nor has argued anything to suggest that some claim-specific investigation was required. This is a dispute about what the insurance policy obligates Progressive to pay for the installation of a windshield, and there is no reasonable basis to conclude that Progressive's means of determining that amount was willful, wanton, and malicious or one committed in reckless disregard of the insured's rights.

As another basis to conclude that entitlement to assert punitive damages had been established, the trial court found that Progressive's purported misrepresentations included "scare" tactics to "steer" an insured "away from his chosen repair facility." Despite Lloyd's of Shelton's sinister characterization of these practices, the evidence does not support a reasonable basis that the alleged acts meet the standard for the recovery of punitive damages. As such—and as is the case for the other acts giving rise to the alleged bad faith violations—this court need not reach the issue of whether they occurred with the requisite "frequency as to indicate a general business practice." *See* § 624.155(5). But the steering allegations suffer from another weakness—there is no record evidence that any such tactics were employed against Mr. Farlow in Progressive's handling of his claim. *See Cook v. Fla. Peninsula Ins.*, 371 So. 3d 958, 962 (Fla. 5th DCA 2023) ("There is no magic number for other evidence required to show frequency of a general business practice in order to assert a claim for punitive damages—at a minimum it is *the plaintiff's own claim* and at least one more." (emphasis added)).

However, the trial court described such tactics as part of an overall "scheme" employed by Progressive to avoid paying the prevailing competitive price, consistent with Lloyd's of Shelton's general theory that Progressive steers insureds to preferred providers and punishes insureds

25

who might select nonaffiliate, nonnetwork providers (as well as nonaffiliate, nonnetwork providers who become assignees of an insured's insurance benefits) by refusing to pay them a price required under the policy. This court need not reach the question of whether conduct that could be deemed a part of a general business practice but was not applied in the plaintiff's specific case could nonetheless be relevant to an overarching bad-faith scheme to which that plaintiff was subjected for purposes of punitive damages entitlement because the alleged tactics in this case—even if they had been directed at Mr. Farlow himself—do not meet the standard for such entitlement.

The allegations are that Safelite, as a proxy for Progressive, informs insureds that network providers will perform the windshield repair for a price that Progressive will likely pay but that nonnetwork providers may perform the windshield repair at a price that Progressive might not pay. There is no evidentiary basis whatsoever to support Lloyd's of Shelton's assertion, with which the trial court agreed and that our dissenting colleague accepts, that Safelite's alleged "steering" tactics are tantamount to misrepresenting that a deductible might apply. Moreover, there is no evidence in this record that any representation at all was made to Mr. Farlow or any other insured regarding a deductible. And such acts of purported "steering" cannot reasonably be deemed misrepresentations at all, much less deception undertaken willfully, wantonly, and maliciously or in reckless disregard for the insured's rights. To the contrary, when Safelite allegedly alerts insureds to the manifestly obvious reality that some providers charge more than others and apprises insureds of the possibility that some providers might charge more than what Progressive has reasonably determined to be a prevailing competitive price, it is arguably conveying valuable information. It is a simple consequence of

26

the policy language that Progressive is not going to pay any and every invoice transmitted for a windshield repair. The policy provides that Progressive is to pay what is *necessary* and allows Progressive to reasonably determine the prevailing competitive rate. If an insured chooses a provider that charges more than what is a reasonable determination of the prevailing competitive rate—which an insured is permitted to do, as nothing in the policy allows Progressive to dictate the repair shop used—that does not render Safelite's admonition a willful, wanton, and malicious misrepresentation or one in reckless disregard of the insured's rights. And if an insured assigns its benefits to a provider and that provider charges more than the price Progressive can obtain through its network of providers with whom it negotiated lower prices, Safelite's admonitions have been proven prescient rather than the prevarications Lloyd's of Shelton characterized them to be.

As such, none of the "steering" allegations or proffered evidence even supports Lloyd's of Shelton's theory of bad faith or the implication that Progressive is violating the statutory prohibition on imposing a deductible for windshield damage, much less entitlement to punitive damages. It is noteworthy that Florida law presumes that an insurer *could* legally *require* an insured to use a particular repair shop. *See* § 626.9743(3) ("An insurer that elects to repair a motor vehicle and specifically requires a particular repair shop for vehicle repairs shall cause the damaged vehicle to be restored to its physical condition as to performance and appearance immediately prior to the loss at no additional cost to the insured or third-party claimant other than as stated in the policy."). And what the statute actually prohibits is arguably the opposite of what Lloyd's of Shelton and the trial court characterize as Progressive's bad-faith steering scheme. The statute

27

prohibits an insurance company that requires a particular repair shop from passing on "additional cost" to the insured as a consequence. *See id.* Here, the allegations are that Progressive's third-party administrator tells insureds that if they select an in-network repair shop, the insured is more likely *not* to incur additional cost.

Progressive—presumably by means of its share of market volume, as the record suggests—has developed the ability to drive down cost by negotiating lower prices for windshield replacements. No legal authority, policy language, or evidence in the record precludes Progressive from concluding that the prices reflected by those transactions constitute a reasonable determination of the prevailing competitive price necessary to repair a windshield. And the fact that Progressive's third-party administrator alerts insureds who inquire about windshield claims that some providers might charge more than what Progressive believes it is obligated to cover under the insurance policy does not constitute a misrepresentation or bad-faith scheme that supports "acts giving rise to [a] violation" that are "[w]illful, wanton, and malicious" or "[i]n reckless disregard for the rights of any insured." *See* § 624.155(5).

Finally, Lloyd's of Shelton asserts that it had a right not to be subjected to a "rigged" appraisal process through Progressive's appointment of a biased appraiser. Lloyd's of Shelton does possess a right under the policy to an unbiased appraiser, as the appraisal provision requires each party to appoint "a competent and impartial appraiser." The remaining question, therefore, is whether there is a reasonable evidentiary basis from which it could be concluded that Progressive violated that right willfully, wantonly, and maliciously or recklessly disregarded that right through the use of Ms. Rollinson as its chosen appraiser.

28

It would be difficult to deny that there might at least be an appearance of a potential conflict of interest arising from Progressive's appointment of an appraiser who simultaneously receives what could be perceived as a "sweetheart deal" for her auto glass repair shop. In other words, there could be an understandable perception that Progressive's chosen appraiser could be incentivized to advocate for a lower appraisal award in Progressive's favor in order to secure more business from Progressive for her repair shop. But the same could be said of Lloyd's of Shelton's chosen appraiser, who herself is also a windshield repair provider theoretically susceptible to her own incentive to advocate for a *higher* appraisal award in order to inflate the rates paid by insurance companies for windshield claims. On the other hand, both arrangements might just as well reflect typical behavior among business associates whose existing relationships make them likely candidates for selection to perform related work. Without more, the mere fact that Progressive had an existing business relationship with its chosen appraiser is unremarkable—even if she had negotiated for herself an exclusive rate structure for windshield replacements that Lloyd's of Shelton had not.

What is determinative is that, on this record, there is not a reasonable evidentiary basis to support the conclusion that Lloyd's of Shelton was denied its right to an impartial appraiser under the theory that Ms. Rollinson was biased *and* that such bias was effectuated by Progressive willfully, wantonly, and maliciously or in reckless disregard of the insured's rights under the policy. The appraisal was conducted jointly by Ms. Rollinson and Lloyd's of Shelton's appointed appraiser, Ms. Martin, who also owns her own auto glass repair shop. Ms. Rollinson never attempted to persuade Ms. Martin to award a price more

29

favorable to Progressive, but rather the two of them agreed on an appraisal award that was nearly double the amount that Progressive initially paid. And the simple fact that the appraisers' agreed-upon award was less than the amount Lloyd's of Shelton invoiced does not otherwise provide a reasonable basis to conclude that the appraisal was "rigged" or "biased" due to Progressive's appointment of Ms. Rollinson.

The only evidence on the matter of bias was presented by Ms. Rollinson herself, who flatly denied being influenced by anyone in her appraisal. Therefore, the theory of a biased process is based solely on speculation. That this speculation is in part based on circumstances that a reasonable observer *could* suspect to be susceptible to the *potential for* bias does not obviate Lloyd's of Shelton's obligation to produce a *reasonable evidentiary basis of* such bias in order to support its theory that Progressive acted in bad faith and in such a way as to have been willful, wanton, and malicious or in reckless disregard of its rights under the policy. *See* § 768.72(1) (requiring that "[i]n any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by *evidence* in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages" (emphasis added)); § 624.155(5) (setting forth the punitive damages standard to be applied to "the acts giving rise to the violation" in a bad faith claim). "Punitive damage amendments are different than traditional amendments in that section 768.72 has created a substantive legal right not to be subject to a punitive damage claim until the trial court rules that there is a reasonable evidentiary basis for punitive damages." *Ober*, 353 So. 3d at 1192 (quoting *Holmes v. Bridgestone/Firestone, Inc.*, 891 So. 2d 1188, 1191 (Fla. 4th DCA 2005)); *see Fed. Ins. v. Perlmutter*, 376 So. 3d 24, 32 (Fla. 4th DCA 2023)

30

(recognizing that "trial courts have a 'gatekeeping' role to preclude a punitive damages claim where no reasonable *evidentiary* basis for recovery exists" (emphasis added) (quoting *Bistline v. Rogers*, 215 So. 3d 607, 611 (Fla. 4th DCA 2017))); *cf. 701 Palafox, LLC v. Scuba Shack, Inc.*, 367 So. 3d 624, 627–28 (Fla. 1st DCA 2023) ("In reviewing whether the trial court's ruling that Scuba Shack made the necessary showing under section 768.72 to allow it to assert a claim for punitive damages, we view the evidence in the light most favorable to Scuba Shack. . . . Even so, we need not take Scuba Shack's allegations of gross negligence at face value.") (first citing *Wayne Frier Home Ctr. of Pensacola, Inc. v. Cadlerock Joint Venture, L.P.*, 16 So. 3d 1006, 1009 (Fla. 1st DCA 2009); and then citing *Fla. Hosp. Med. Servs., LLC v. Newsholme*, 255 So. 3d 348, 351 (Fla. 4th DCA 2018))). And "a reasonable showing by evidence in the record or proffered by the claimant," § 768.72(1), "refers to actual evidence that would provide a prima facie basis to recover punitive damages." *DeSanto*, 362 So. 3d at 249 (citing *Marder v. Mueller*, 358 So. 3d 1242, 1245 (Fla. 4th DCA 2023)). A statutory burden demanding a reasonable *evidentiary* basis cannot be sustained based on theory alone.

Accordingly, we conclude that Lloyd's of Shelton failed to make a reasonable evidentiary showing that Progressive committed acts giving rise to the alleged bad faith violations that were willful, wanton, and malicious or in reckless disregard for the rights of any insured. We reverse the trial court's order granting the motion for leave to amend to add a claim for punitive damages and remand for further proceedings.

Reversed and remanded.


KELLY, J., Concurs.
KHOUZAM, J., Dissents with opinion.


31

KHOUZAM, Judge, Dissenting.

Because the majority misapplies the legal standard for amendment to claim punitive damages, I respectfully dissent. Rather than viewing the totality of the proffered evidence in the light most favorable to the moving party as required under settled law, the majority breaks down the broad alleged scheme into its individual component parts, evaluating each one piecemeal, fully insulated from the context of the others. The majority then impermissibly weighs the proffered evidence in each silo and, in so doing, denies the movant its right to the benefit of reasonable inferences, ultimately making affirmative factual findings of what it believes has been proven at this stage of the litigation.

This approach leads the majority to conclude that there is nothing to see here, even while acknowledging that the evidence creates the appearance of a known conflict of interest in an appraisal process promised to be impartial. But, in my view, the correct application of the standard demands the conclusion that these claims should go to a jury.

The Governing Legal Standard

Section 768.72(1), Florida Statutes (2023), prohibits claims for punitive damages "unless there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages." Thus, before such claims may be permitted, the movant "shall make a reasonable showing, by evidence in the record or evidence to be proffered by the claimant, that provides a reasonable basis for recovery of such damages." Fla. R. Civ. P. 1.190(f).

As the majority acknowledges, we "review a trial court's decision to grant a motion to amend a complaint to add claims for punitive damages de novo." *CCP Harbour Island, LLC v. Manor at Harbour Island, LLC*, 373 So. 3d 18, 27 (Fla. 2d DCA 2023); *see also Fed. Ins. v. Perlmutter*, 376 So.

32

3d 24, 34-35 (Fla. 4th DCA 2023) (en banc) (same)[5]; *Cook v. Fla. Peninsula Ins.*, 371 So. 3d 958, 961 (Fla. 5th DCA 2023) (same).

But de novo review does not mean that an appellate court may simply review the proffered evidence to determine whether the court itself is persuaded that the allegations have been proven. Rather, so long as the evidence is legally sufficient to support an award, the task of weighing the evidence to determine whether the claimant has proven any of its claims is for the jury alone. *See, e.g.*, *Perlmutter*, 376 So. 3d at 34 ("stress[ing] that the preliminary determination of whether the movant made a reasonable showing by evidence of a reasonable basis for allowing a punitive damages claim is to be made <u>without</u> weighing evidence or witness credibility"); *Est. of Despain v. Avante Grp., Inc.*, 900 So. 2d 637, 645 (Fla. 5th DCA 2005) ("stress[ing]" in determining right to plead a claim for punitive damages that "[w]hether [the claimant] will be able to prove entitlement to an award will depend on the jury's view of the evidence submitted").

Consequently, "[u]nder the de novo standard, this [c]ourt views the record evidence and the proffered evidence in the light most favorable to the plaintiff and accepts said evidence as true for the purpose of reviewing whether a reasonable basis exists for punitive damages." *Cook*, 371 So. 3d at 961 (citing *Est. of Despain*, 900 So. 2d at 644); *see also CCP Harbour Island*, 373 So. 3d at 27 ("In evaluating the sufficiency of the evidence proffered in support of a punitive damages claim, the evidence is viewed in a light favorable to the moving party." (quoting *Case v. Newman*, 154 So. 3d 1151, 1157 (Fla. 1st DCA 2014))); *Perlmutter*, 376 So. 3d at 34 (explaining that section 768.72 requires the trial court to

---

[5] The parties have not raised any arguments in this court suggesting that the conflict certified in *Perlmutter* is relevant here.

33

"view[] the totality of proffered evidence in the light most favorable to the movant" and "give[] the movant the benefit of all reasonable inferences").

"[T]he standard that applies to determine whether a reasonable basis has been shown to plead a claim for punitive damages should be similar to the standard that is applied to determine whether a complaint states a cause of action." *Cook*, 371 So. 3d at 961 (citing *Est. of Despain*, 900 So. 2d at 644-45); *see also Werner Enters. v. Mendez*, 362 So. 3d 278, 281-82 (Fla. 5th DCA 2023) (same); *Holmes v. Bridgestone/ Firestone, Inc.*, 891 So. 2d 1188, 1191 (Fla. 4th DCA 2005) ("When a trial court is determining if a plaintiff has made a 'reasonable showing' under section 768.72 for a recovery of punitive damages, it is similar to determining whether a complaint states a cause of action . . . ."). "Thus, the court asks 'whether a reasonable jury could infer' from the proffer that the defendant's conduct satisfies the statutory criteria for punitive damages." *Werner Enters.*, 362 So. 3d at 282 (quoting *Varnedore v. Copeland*, 210 So. 3d 741, 747 (Fla. 5th DCA 2017)).

This Case

Under this standard, at this stage of the litigation, the question is sufficiency—not ultimate proof. Thus, many factual determinations made or implied in the majority are simply not before this court. Among them are: (i) what is the "prevailing competitive price" for windshield replacement; (ii) whether Progressive in fact made any misrepresentations to Lloyd's; (iii) the substance of Progressive's criteria for demanding appraisal and its good or bad faith in doing so; and (iv) whether the "sweetheart deal" Progressive had with its appraiser resulted in any bias.

Essentially, it is not for this court to decide whether Lloyd's has proven <u>any</u> fact it alleges—much less a resulting entitlement to punitive

34

damages. Nor may we consider each allegation and its supporting evidence in isolation, apart from the other pieces of the alleged cohesive scheme. The only issue properly before us is whether Lloyd's has proffered sufficient allegations and evidence to satisfy the section 768.72 requirement of a reasonable evidentiary basis for a jury to properly find entitlement to punitive damages on its claims. I would hold that it has.

Lloyd's has alleged a multifaceted scheme by Progressive over a period of several years to deprive many insureds of their rightful policy benefits. In broad terms, Lloyd's alleges that Progressive deliberately underpaid windshield policy benefits and automatically invoked appraisal any time the insured declined to accept Progressive's lowball offer, thereby forcing the insured into a dilemma of accepting the underpayment or participating in—and bearing the cost of—appraisal.

Lloyd's alleges further that, where the insured refused Progressive's underpayment and engaged in appraisal, Progressive routinely broke its policy promise of an impartial appraiser by selecting a biased one with whom it had a "sweetheart" deal, thereby "rigging" the appraisal process in its favor and further minimizing the insured's rightful payout. Lloyd's asserts that this scheme constitutes bad faith, violates several statutory provisions, and occurred frequently enough to warrant punitive damages.

As required by section 768.72 and rule 1.190(f), Lloyd's proffered evidence supporting its allegations. The evidence proffered below includes: the deposition of Progressive's corporate representative, the deposition of Progressive's chosen appraiser, Lloyd's sworn interrogatory answers, a confidential agreement between Progressive and Safelite Solutions,[6] the applicable insurance policy, and correspondence between

---

[6] This agreement is not in our record. But it was presented to the trial court below for *in camera* inspection and, in any event, Progressive's

Progressive and Lloyd's. Accepting the proffered evidence as true and viewing it in the light most favorable to Lloyd's, as Florida law expressly requires, it supports at least the following facts and inferences.

For "many years," Progressive has had an agreement in place with Safelite Solutions. Thereunder, when insureds call Progressive's claims reporting number with glass claims, the calls are automatically transferred to Safelite, who takes them on Progressive's behalf in return for a fee. Generally, Safelite takes information from the insured and schedules repairs and replacements for their glass-only claims.

From time to time, Progressive audits Safelite to ensure that Safelite is taking the calls and handling them according to Progressive's rules and procedures. Among them are that "Progressive determines the pricing" discussed, not Safelite. And Progressive's corporate representative was adamant in his deposition that in choosing which repair shop to use, "customer choice in these matters is paramount to Progressive. So customer choice is always honored."

Even so, one of the things Progressive pays Safelite to do is to "steer" glass claimants to choose Progressive's preferred repair shop. Although Florida law does not prohibit such steering by itself, Safelite steers for Progressive in part by implying that choosing the wrong shop

corporate representative testified at length about the agreement in his deposition. Although the majority acknowledges that Progressive sought a writ of certiorari to quash the trial court's order compelling production of the agreement, it omits that this court denied Progressive's petition in a written opinion. *See Progressive Select Ins. v. Lloyd's of Shelton Auto Glass, LLC*, 367 So. 3d 586, 590 (Fla. 2d DCA 2023) (concluding that "Progressive has not shown a departure from the essential requirements of law and is not entitled to certiorari relief" because "the trial court engaged in the appropriate analysis and made the necessary findings in support of its order directing release of the Agreement and compliance with the terms of the parties' confidentiality agreement").

36

may require the insured to pay a deductible for windshield repair or replacement, even though Florida law and Progressive's own policy prohibit such a deductible. *Compare* § 626.9743(3), Fla. Stat. (2023), (providing that an insurer may "specifically require[] a particular shop for vehicle repairs"), *with* § 627.7288, Fla. Stat. (2023), ("The deductible provisions of any policy of motor vehicle insurance . . . shall not be applicable to damage to the windshield of any motor vehicle covered under such policy."). To facilitate this steering, Progressive provides Safelite with the calling insured's deductible information, even though such information is irrelevant to windshield claims by virtue of the overlapping prohibitions set forth by law and in Progressive's own policy.

As it turns out, the preferred shop Safelite steers Progressive's insureds to is Safelite's own "repair/replacement arm," Safelite Auto Glass. Under their agreement, Safelite Auto Glass performs windshield work for Progressive at steep discounts. Many other local shops, including Lloyd's, generally charge more than Safelite charges Progressive. As Progressive's own appraiser summarized in deposition:

> When an insured—let's just say a Progressive insured picks up the phone and calls in the 800 number on their card to call in a windshield claim. They go into the Safelite network. And if you're not a network shop, then they're often told, "Well, we can't guarantee their pricing. There could be an out-of-pocket expense, but if you go to Safelite, you won't have to worry about that."

> So Safelite uses a lot of tactics to try and scare the insured into choosing Safelite. And therefore, we call that steering because Safelite is constantly steering people to Safelite . . . So when they put the scare tactics into the customer saying that we can't guarantee their work, there could be an out-of-pocket expense, that's what we call steering.

37

If an insured refuses Progressive's offer to pay the steeply discounted amount Progressive has negotiated with Safelite, then Progressive triggers the appraisal process. According to Lloyd's, Progressive does so without ever having individually adjusted the loss according to the policy and without any further analysis or correspondence. Because Safelite performs the "first notice of loss" services by taking the insured's claims reporting call, Progressive may initiate the appraisal by letter without ever attempting to speak directly with the insured—as happened here, when Progressive sent its appraisal demand in response to receiving Lloyd's invoice.

Progressive's appraiser in this case was Linda Rollinson. Ms. Rollinson owns Auto Glass Industry Services, Inc. (AGIS), which performs appraisals and consulting services. Through AGIS, Ms. Rollinson performed "somewhere around several hundred thousand" appraisals for Progressive between 2016 and 2022. In 2020 alone, Progressive paid AGIS approximately $50,000 for appraisals.

In addition to AGIS, Ms. Rollinson also owns Superior Auto Glass of Tampa Bay, Inc. Superior is a shop that performed windshield repairs and replacements for Progressive during the period when Ms. Rollinson was also frequently performing appraisals for Progressive through AGIS.

While Ms. Rollinson was both conducting appraisals and performing windshield work for Progressive through her businesses, Progressive was paying Superior more than it was paying for repairs by other shops. Specifically, for each such job, on top of what Superior received through Safelite in the regular claims process, Progressive would give Superior an additional check outside of the claims process.

When Progressive's supplemental payments to Superior began, they already netted Superior more than what Progressive offered insureds

38

through Safelite; whereas Safelite charged Progressive steeply discounted rates, Progressive's supplemental payments to Superior closed the gap so that Superior was doing the same work for Progressive at only a small discount from standard pricing. Then, Progressive's supplemental payments to Superior outside the claims process increased further over time; "after a while, there was no discount."

Ms. Rollinson also testified that, during the period of time when she was performing appraisals for Progressive, "Superior Auto Glass of Tampa Bay had a verbal agreement with Progressive for payments and no steering and no appraisals for auto glass repair and replacement services on their insureds." During that period, "on every windshield claim which was submitted for reimbursement by Superior Auto Glass of Tampa Bay to Progressive . . . none of those claims appraisal was invoked upon." Ms. Rollinson explained further:

> Superior Auto Glass, with the agreement that I had and—with Superior Auto Glass and the appraisals I was doing under Auto Glass Industry Services, Progressive or Safelite, whoever it is that sent out the letters, might—the customers for Superior Auto Glass would call in a claim, get hooked to Safelite, and the claim would—or referral number from Safelite Solutions would be sent over to Superior Auto Glass and they wouldn't get steered.

> And they wouldn't get a letter in the mail saying that there's a discrepancy in pricing between X shop and Progressive and—they call it an appraisal letter. It's a page-and-a-half letter about appraisals. And Superior's customers were not subject to that, either.

Consequently, Ms. Rollinson testified that while she "w[as] appraising for Progressive through [AGIS], [she] w[as] essentially being paid more for [Superior]'s windshield replacement reimbursement claims than other" nonnetwork shops. And "as an additional benefit to [Superior], [her] claims would not be passed through appraisal or

39

Progressive would not invoke appraisal on [Superior]'s claims," even if they were higher than claims repaired through Safelite.

Ultimately in this case, the appraisal process resulted in nearly doubling the amount of Progressive's pre-appraisal offer. Ms. Rollinson admitted in deposition that she initially proposed a lower value in the appraisal, but both appraisers "were both able to meet in the middle."

Presently, Ms. Rollinson is no longer conducting appraisals for Progressive. In her deposition in this case, she testified that Progressive stopped using her as an appraiser in 2022 because she testified unfavorably to Progressive in a deposition in another case.

Considering the totality of the supporting evidence, I would hold that leave to amend was properly granted. Accepting the evidence as true and giving Lloyd's the benefit of all reasonable inferences as Florida law requires, Lloyd's has proffered enough to permit a jury to award punitive damages on its bad faith claims. This court should not take Lloyd's claims from a jury.

Despite acknowledging in passing that the evidence must be accepted as true and viewed in the light most favorable to Lloyd's, the majority then fails to apply that standard. Instead, the majority stringently weighs the evidence of each individual component of the alleged scheme in piecemeal, leading to serial conclusions that none of them, standing alone, proves Lloyd's claims.

For example, the majority states the trial court's ruling "begs the question of what is a reasonable determination of the amount necessary to repair the windshield within the prevailing competitive price." Then, the majority purports to answer its factual question in Progressive's favor, affirmatively finding that the "record tend[s] to show that

40

Progressive's determination of the prevailing competitive price was *reasonable*," thereby precluding Lloyd's from meeting its burden.[7]

Not only is the factual question of price not before the court at this stage, but also, in answering it, the majority considers the issue divorced from the greater context. Indeed, later in the opinion, the majority adopts Progressive's myopic framing of the case, saying "[t]his is a dispute about what the insurance policy obligates Progressive to pay for the installation of a windshield."

In so doing, the majority sidesteps the allegations and proffered evidence supporting the punitive damages claim that the determination of amount was but one part of a larger scheme—specifically, that

---

[7] To support this factual determination, the majority cites to a footnote from another decision involving windshield coverage. *See GEICO Gen. Ins. v. Superior Auto Glass of Tampa Bay, Inc.*, 49 Fla. L. Weekly D169, D174 n.4 (Fla. 2d DCA Jan. 17, 2024). In addition to impermissibly supporting a factual finding by an appellate court, this reliance is troubling for at least two other reasons.

First, the cited footnote in *GEICO* expressly says that the point it addresses does not apply in that case. *Id.* (opining what standard might apply "[i]f not for" prior litigation constituting binding law of the case). The footnote is therefore nonbinding dicta. *See, e.g., Parsons v. Culp*, 328 So. 3d 341, 354 (Fla. 2d DCA 2021) (Atkinson, J., concurring in part and dissenting in part) (quoting *Cirelli v. Ent*, 885 So. 2d 423, 427 (Fla. 5th DCA 2004) (concluding that a statement in another opinion "does not have the weight of controlling precedent" because "[a] statement in a judicial opinion that is 'unnecessary to the resolution of the issue before the court' constitutes dicta and is 'not controlling judicial precedent.' ")).

Further, the only panel member who agreed with the contents of that footnote was the author, thereby precluding it from having any binding precedential value. *See* art. V, §4(a), Fla. Const. ("Three judges shall consider each case and the concurrence of two shall be necessary to a decision."). Such authorities "must be read with caution." *State v. Lebron*, 979 So. 2d 1093, 1095 (Fla. 3d DCA 2008).

Progressive's claims practices in this context are devised to manufacture disputes in order to funnel cases into biased appraisals. Indeed, the majority's factual discussion about the reasonableness of Progressive's pricing misses the point entirely, as the mere fact that the evidence might allow a jury to ultimately side with Progressive does not address the different question presently before this court: whether Lloyd's has proffered sufficient evidence to bring its claims to a jury in the first place.

The majority likewise denies Lloyd's the reasonable inference that the steering practices in evidence could possibly involve a misrepresentation about the applicability of a deductible. Where the majority sees a "logical fallacy" in accepting Lloyd's evidence-backed claims as true and in the light favorable to it, the trial court was simply dutifully applying the standard required by settled Florida law.

Perhaps the clearest example of the dispositive flaw in the majority's analysis is its discussion of Ms. Rollinson's potential bias in appraising for Progressive. The majority acknowledges that the evidence of Progressive's and Ms. Rollinson's former business relationship "could be perceived as a 'sweetheart deal,' " such that "there could be an understandable perception that Progressive's chosen appraiser could be incentivized to advocate for a lower appraisal award in Progressive's favor in order to secure more business from Progressive for her repair shop." Further, the majority admits that it cannot "deny that there might at least be an appearance of a potential conflict of interest arising from Progressive's appointment of" such an appraiser in a process required by policy and law to be impartial.

Yet, even so, the majority concludes that Lloyd's "theory of a biased process is based solely on speculation." To reach that conclusion, the majority reasons that the evidence "might just as well reflect typical

42

behavior among business associates whose existing relationships make them likely candidates for selection to perform related work." Once again, the majority weighs the evidence and, once again, gives Progressive the benefit of the doubt—directly contrary to the standard Florida law obligates this court to apply.

Simply put, if one cannot deny that the evidence creates the appearance of a clear conflict of interest in a process where impartiality is guaranteed, then a theory of bias is not mere speculation. *C.f.*, *Tundidor v. State*, 361 So. 3d 775, 777 (Fla. 2023) (quoting *State v. Oliu*, 183 So. 3d 1161, 1163 (Fla. 3d DCA 2016) (emphasizing in judicial context that "[a]ctual bias or prejudice need not be shown, rather it is the appearance of bias or prejudice which requires disqualification")).

Moreover, while simultaneously calling the evidence it discusses insufficient, the majority ignores other directly relevant supporting evidence in the record. In particular, Ms. Rollinson testified that Progressive actually stopped using her for appraisals sometime after the one in this case because she gave (presumably truthful) testimony in another case. Whatever a factfinder might ultimately conclude about Ms. Rollinson's credibility in testifying about a soured business relationship, this court is required to accept it as true at this stage of the litigation.

Accepting it as true, her testimony unequivocally supports Lloyd's allegations of bias. It certainly provides more than mere speculation that the lucrative preferential arrangement Ms. Rollinson's businesses enjoyed with Progressive for several years was dependent at least in part on her giving answers Progressive approved—according to her, Progressive ended their special relationship as soon as she stopped doing so. In context, a jury could reasonably infer that the evidence of an undeniable appearance of a conflict of interest in Progressive's appraisal

43

process in "several hundred thousand" cases resulted in some bias, rendering them not "impartial" as Progressive promises in its policy.

One final matter warrants comment. The majority criticizes this dissent for "neglect[ing]" to identify acts giving rise to bad faith violations in favor of focusing instead on the issue of amendment. But once again, the question the majority poses is simply not before this court—this is not a motion to dismiss for failure to state a bad faith claim.

Indeed, the trial court already <u>denied</u> Progressive's motion to dismiss the bad faith claim. That ruling—that the acts identified in this case state a cause of action for bad faith—is not part of this nonfinal appeal of the legally distinct ruling granting leave to amend to seek punitive damages. On the only question properly before this court, and under the sufficiency standard we are obligated to apply, I have no trouble concluding that Lloyd's evidence of Progressive's deliberate underpayment of policy benefits, misrepresentations to insureds, and known biased appraisals in hundreds of thousands of cases satisfies the statutory requirements of frequency and that the defendant's acts must be "willful, wanton, and malicious" or, at a minimum, "in reckless disregard of the rights of any insured." § 624.155(5), Fla. Stat. (2020).

At bottom, in light of all of the foregoing evidence proffered by Lloyd's, I believe the trial court properly permitted amendment in the context of this case. Accordingly, I would affirm the order under review.

_____

Opinion subject to revision prior to official publication.

44